**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EARNEST SHIELDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 10 CV 3746** |
| | ) | |
| **ILLINOIS DEPARTMENT** | ) | **Judge Ronald A. Guzman** |
| **OF CORRECTIONS, et al.,** | ) | |
| | ) | **Magistrate Susan E. Cox** |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS WEXFORD HEALTH SOURCES, INC.,**
**DR. RICHARD SHUTE, DR. ROBERT MIGLIORINO, DR. RONALD SCHAEFER AND**
**DR. ARTHUR FUNK'S MOTION FOR SUMMARY JUDGMENT**

**NOW COMES** the Plaintiff, Earnest Shields, by and through his attorney, JAMES A.

KARAMANIS of BARNEY & KARAMANIS, LLP and in response to Defendants' Wexford

Heath Sources, Inc., Dr. Richard Shute, Dr. Robert Migliorino, Dr. Ronald Schaefer and Dr.

Arthur Funk Motion for Summary Judgment states as follows:

**STANDARD**

Summary judgment is warranted only if "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law." Outlaw v. Newkirk, 259 F.3d

833, 836-37 (7th Cir. 2001). In ruling on a motion for summary judgment, the judge's role is not

to evaluate the weight of the evidence or to determine the truth of the matter, but instead to

determine whether there is a genuine issue of triable fact. Id. All doubts should be resolved in

the nonmoving party's favor. Id. In addition, the court must view all the evidence in the record

in the light reasonably most favorable to the non-moving party and resolve all factual disputes in

favor of the non-moving party. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Butler v. Indianapolis Metro. Police

Dept., 1:07-CV-1103DFHTAB, 2009 WL 2841079 (S.D. Ind. Sept. 1, 2009).

A party moving for summary judgment must "identify pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact" and demonstrate that it is entitled to

judgment as a matter of law. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001), citing

Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir.1996) (citing Celotex Corp. v.

Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation and internal

quotation omitted)).

Failing to provide medical treatment to an inmate violates the Eighth Amendment when it

constitutes deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97,

104 (1976). The injury must be objectively serious and the official must have a state of mind

that is deliberately indifferent to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825,

834 (1984). An objectively serious medical need is one that has been diagnosed by a physician

as mandating treatment. Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001). A prison

official may be found to be deliberately indifferent when reasonable requests for medical

treatment are denied and/or delayed for non-medical reasons. Scantling v. Vaughn, 2004 WL

306126 at 7 (E.D.Pa. 2004). Subjective recklessness, as used in criminal law, is the appropriate

test for "deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed.

2d 811 (1994). A six-month delay in providing an appointment with a specialist and then

refusal to then follow the specialist's advice meets the standard of deliberate indifference to a

serious medical need. Jones v. Simek, 193 F.S.3d 485 (7th Cir. 1999), Gil v. Reed, 381 F.3d 649,

663 (7th Cir. 2004).

**Preliminary Statement**

During all times referenced in the Second Amended Complaint, Plaintiff, Earnest Shields ("Shields"), was confined within the Illinois Department of Corrections ("IDOC"). Wexford is responsible for and provides the medical care of inmates in the IDOC system. <u>See</u> Exhibit I-Dep. of Hardy at 21. While Plaintiff does not contest that Count I of the Second Amended Complaint ("SAC") contains claims against Defendants Wexford Health Sources, Inc., Dr. Richard Shute, Dr. Robert Migliorino, Dr. Ronald Schaefer and Dr. Arthur Funk (the "Wexford Defendants") for deliberate indifference to Plaintiff's medical needs, Plaintiff further contends that Count I also asserts a claim for medical negligence against the Wexford Defendants which is not subject to, or part of, the Wexford Defendants' present Motion for Summary Judgment, which has been limited to seeking judgment on Plaintiff's deliberate indifference claims. <u>See</u> Exhibit F-SAC at Count I at paras. 24(b), (c) and (e); Exhibit R-Report and Resume of Dr. Kenney; Exhibit S-Report of Dr. McFarland.

In support of the medical negligence claims against the Wexford Defendants, Plaintiff provided a medical review and report opinion pursuant to 735 ILS 5/2-622 concluding that Shields was treated inadequately and below the standard of care by Wexford Defendants. <u>See</u> Exhibit S-Report of Dr. McFarland.

I.    <u>Referrals of Inmates to Outside Medical Specialists and the Collegial Review Process</u>

On June 16, 2008, Shields injured his shoulder while engaging in recreational activities at Hill Correctional Center. It was determined that his injury required a consultation with an outside specialist. However, before an inmate can be referred to an outside specialist, Wexford first conducts what is called a "collegial review" whereby the Medical Director of the facility discusses and approves any off site referrals with the Regional Medical Director. <u>See</u> Exhibit G-

Dep. of Funk I at 73.  It is both the responsibility of the Medical Director and the Regional

Medical Director to find the appropriate medical specialist when the patient needs to see one.

See Exhibit J-Dep of Schaefer at 53.  From the date of Plaintiff's injury on June 16, 2008,

through Dr. Migliorino's termination on October 7, 2008, Dr. Robert Migliorino was the Medical

Director at Hill.  Id. at 30.  As Medical Director, Dr. Migliorino was responsible for ensuring that

inmates received proper specialist care at outside facilities.  After Dr. Migliorino's termination

on October 7, 2008, the role of Medical Director was filled by a series of Wexford physicians

including Dr. Lochard, Dr. Mughall and Dr. Schaefer.  See Exhibit H-Dep of Funk II at 55-56.

The Medical Director position was supervised by Regional Medical Director Dr. Arthur

Funk.  See Exhibit G-Dep of Funk I at 12, 30.  As Regional Medical Director, Dr. Funk made

final call on whether a patient would be sent to an outside facility for treatment.  Id.; See Exhibit

J-Dep of Schaefer at 18.  Even though the collegial review process is between physicians, it is

ultimately the Regional Medical Director's decision on whether to send out a patient to a

specialist.  See Exhibit J-Dep of Schaefer at 39.

## II.        Referral of Shields to Orthopedic Specialists who Recognized the Need for Surgery.

On June 16, 2008, Shields ruptured his left pectoralis tendon while bench pressing

approximately 345 lbs at Hill.  On June 23, 2008, Shields was sent to See Dr. Schierer, an

orthopedic surgeon, for evaluation of his shoulder.  Dr. Schierer is a board certified orthopedic

surgeon.  See Exhibit D-Schierer Dep at 7.  After his examination of Plaintiff, he concluded that

Plaintiff had "a pectoralis tendon rupture of the left chest and shoulder" and that Shields "needs

to see a shoulder specialist for surgery" because he had "not performed this surgery in the past."

See Exhibit A-Med Recs at 113.  (Emphasis added.)  Dr. Schierer further noted that he did not

have the expertise "to perform the surgery necessary to treat this problem." <u>See</u> Exhibit A-Med Recs at 114.

After a collegial review between Drs. Funk and Migliorino, Shields was then sent to Dr. Clark on August 18, 2008. After examining Plaintiff, Dr. Clark did not feel comfortable performing the surgery required for Plaintiff, and referred Shields to another shoulder specialist, Dr. Gibbons. <u>See</u> Exhibit A-Med Recs at 20-22. After receiving Plaintiff's medical records and without examining Shields, on August 14, 2008, Dr. Gibbons also did not "feel comfortable doing [Plaintiff's] surgery." <u>See</u> Exhibit A-Med Recs at 22. Each respective referral was reviewed and approved by Dr. Migliorino and Dr. Funk during the collegial review process. <u>See</u> Exhibit G-Dep of Funk I at 62-64.

### III. <u>Referral of Shields to Dr. Olysav under the Mistaken Belief that He was a Shoulder Specialist</u>

Up to this point in Plaintiff's treatment, Wexford and its staff had attempted to locate the appropriate specialist for Plaintiff and had taken appropriate steps to do so. However, after this point in time, Wexford became deliberately indifferent to the medical care necessary to treat Plaintiff's injury, and such indifference caused Plaintiff significant and permanent harm. Dr. Migliorino acknowledged that the proper course of treatment was to "find somebody who feels comfortable doing the shoulder surgery." <u>See</u> Exhibit K-Dep. of Dr. Migliorino at 104. He further testified it would <u>not</u> be the appropriate care to refer Shields to a general orthopedist for evaluation. <u>Id.</u> at 106. (Emphasis added). Yet, that is precisely what occurred when Shields was referred to Dr. Olysav, a general orthopedist on August 26, 2008.

#### A. **Dr. Olysav was not a shoulder specialist and could not perform the surgery**

After Dr. Gibbons indicated that he was not comfortable performing Plaintiff's required surgery, Drs. Migliorino and Funk referred Shields to Dr. Olysav, a general orthopedist at

Southern Illinois University, for evaluation on August 26, 2008.  Id. at 107.  When they did so, Drs. Migliorino and Funk were under the mistaken belief that Dr. Olysav was a shoulder specialist.  See Exhibit L-Dep. of McFarland at 107-108; See Exhibit G-Dep. of Dr. Funk at 103.  Not only was Dr. Olysav not a shoulder specialist, but he was completely inexperienced and unfamiliar with Mr. Shields' injury, having never previously treated a torn pectoralis major tendon or muscle.  See Exhibit E-Dep. of Olysav at 17.  Despite the lack of expertise in the injury, Dr. Funk completely deferred to Dr. Olysav's opinion and that deference destroyed any chance Plaintiff had to receive proper treatment for his shoulder.  See Exhibit G-Dep of Funk I at 112.

Both Dr. Migliorino and Dr. Funk believed that Dr. Olysav was a shoulder specialist, but neither checked nor even inquired into Dr. Olysav's credentials prior to referring Mr. Shields to him.  If either doctor had performed the slightest due diligence, they would have realized that Dr. Olysav was not a shoulder specialist and could not perform the surgery that Shields required.  See Exhibit E-Dep. of Olysav at 17.  Instead of performing the surgery that Shields required, Dr. Olysav prescribed physical therapy.  See Exhibit A-Med Recs at 60.  According to Dr. McFarland the, "suggestion that the patient have physical therapy and strengthening is a gross injustice to Mr. Shields."

B. **Dr. Migliorino spoke directly to Dr. Olysav and failed to ascertain his lack of expertise in the area of the shoulder**

Dr. Migliorino's negligence in following through with patient care was evident in the lack of diligence in which he dealt with Dr. Olysav.  Dr. Migliorino spoke with Dr. Olysav approximately one month after Shields' August 26, 2008 visit and confirmed the treatment plan of physical therapy.  See Exhibit A; Med Recs at 27.  However, there was no discussion or documentation regarding a follow up plan after therapy was completed.  During that

conversation, Migliorino did not inquire into Dr. Olysav's credentials or attempt to reconcile the discrepancy between Dr. Olysav's recommendations and the recommendations of three other orthopedists, including two shoulder specialists, all of whom determined that Shields required surgery. Despite numerous opportunities to do so, Dr. Migliorino and Dr. Funk failed to ascertain Dr. Olysav's lack of expertise in the area of the shoulder or devise a plan for follow up care. According to Plaintiff's Medical Expert, Dr. McFarland, Dr. Funk "breached the standard of care when he referred Mr. Shields to Dr. Olysav thinking that he was a shoulder specialist when he was not." See Exhibit L-Dep of McFarland at 103. As an inmate, Shields "did not have a right to determine who should be providing… [his] reasonable medical care" and thus was forced to rely, to his detriment, on Wexford physicians like Dr. Funk and Dr. Migliorino to properly vet his specialist referrals. See Exhibit G-Dep of Funk I at 38. Unfortunately, no such vetting ever took place.

### IV.    The Wexford Defendants Were Deliberately Indifferent to Plaintiff's Care and Treatment After Referring Him to Olysav

After Shields was prescribed physical therapy by Dr. Olysav, the very next day Shields filed a formal grievance stating that that he was "told that it would take reconstructive surgery to repair the damage[d] muscles and tissues," yet he was not receiving the surgery he needed. See Exhibit A; Med Recs at 25. The reviewing counselor for Shields' grievance, Evelyn Johnston, responded:

> "The HCUA responds that IM was seen by 3 different specialists because the first two were unable to possibly do the procedure. The third specialist was a shoulder specialist who determined that surgery was unnecessary and prescribed that [inmate Shields] needs to do rehab for range of motion and strengthening."

See Exhibit A, Med Recs at 25.

The information contained in Evelyn Johnston's response was obtained from Dr. Migliorino.

See Exhibit O-Dep of Lindorff at 48-49. However, nowhere in Dr. Olysav's report, nowhere in

his medical records and nowhere in his deposition testimony does it indicate that Dr. Olysav was of the opinion that surgery was unnecessary. See Exhibit A-Med Recs at 63-64; see Exhibit E. To the contrary, Dr. Olysav was of the opinion that the therapy was needed in the event surgery was actually necessary. See Exhibit E, Dep of Olysav at 42-43. Ms. Johnston's response was also untimely in that it was not completed until September 11, 2008 or until almost two full weeks after the grievance was filed. See Exhibit A; Med Recs at 25.

## A. Dr. Olysav did not refer Shields to a shoulder specialist but prescribed three physical therapy sessions

Dr. Olysav was completely inexperienced with Shields' injury and in stark contrast to the recommendations of two previous orthopedists, both of whom examined Shields and recommended surgery, he prescribed physical therapy. See Exhibit K-Dep of Dr. Migliorino at 111-112; See Exhibit E-Dep of Olysav at 17. Olysav's treatment plan, in and of itself, breached the standard of care according to Wexford's own physician in that "a reasonably careful physician would not prescribe treatment for an injury, or condition that the physician is not familiar with." See Exhibit M-Dep of Shute at 62. Despite this significant difference in opinion, Dr. Migliorino and Dr. Funk did not question Dr. Olysav's recommendation, but rather thoughtlessly approved the physical therapy recommendation. See Exhibit A-Med Recs at 24. This was particularly problematic in that Dr. Migliorino had very recently reviewed and approved each prior referral and report, all of which stated that surgery was necessary. The obvious questions were not asked, that is, what do we do with Shields after therapy and is surgery contemplated after the therapy. In signing off on the physical therapy recommendation, Dr. Migliorino significantly altered the sequence of events in which all involved parties had previously been operating under the common assumption that Shields required surgery. From that point on, everyone operated under the incorrect understanding that Dr. Olysav was a

shoulder specialist and that Shields did not require surgery. In other words, at that point Shields was "pointed down the path of non-operative treatment from which he never came off." <u>See</u> Exhibit L-Dep of McFarland at 60.

**B. Plaintiff complied with the physical therapy sessions as prescribed by Dr. Olysav to the best of his ability**

Despite the fact that physical therapy was recommended on August 26, 2008, Wexford did not arrange for Shields to be seen by a physical therapist until October 9, 2008. <u>See</u> Exhibit A- Med Recs at 30. At that point, Mr. Shields was referred to physical therapist, Jason Grandone at Cottage Rehabilitation & Sports Medicine ("Cottage Rehab"). During each one of Shields' physical therapy sessions, Mr. Grandone completed a Medical Special Services Referral and Report form sent by Hill. <u>See</u> Exhibit A-Med Recs at 30. In Mr. Grandone's report dated October 28, 2008 he recommended that "patient has not benefited from [physical therapy] and has been unable to progress toward pain relief and [range of motion] goals per MD." <u>See</u> Exhibit A- Med Recs at 132. He further stated that Shields would "benefit from [evaluation] by orthopedic [doctor]." <u>Id;</u> <u>see</u> Exhibit U-Dep of Grandone at 35-36.

**C. The Wexford Defendants failed to send Plaintiff back to Dr. Olysav after the completion of the physical therapy**

Neither Dr. Funk nor any of the physicians he supervised ever signed off on nor followed up on Mr. Grandone's recommendation for further evaluation. In addition to the obvious need for follow up, Grandone also noted that Shields experienced pain during physical therapy. According to Wexford own physician, if a patient experienced pain during the course of prescribed treatment, the patient should receive a clinical evaluation." <u>See</u> Exhibit G-Dep of Funk I at 39-40. It was the responsibility of both the Medical Director and the Regional Director to ensure that Plaintiff obtained the proper follow up care after the therapy sessions. <u>See</u> Exhibit

J-Dep of Schaefer at 53. Yet, this never occurred and Shields was never referred back to Dr. Olysav after completion of the physical therapy. In fact, there was no referral to any other specialist to treat Shields' injury between October 7, 2008 and July 9, 2009. See Exhibit H-Dep of Funk II at 53. Shortly thereafter Dr. Schaefer determined that Shields had no treatment plan and his medical hold was removed.

**V.    Wexford's practices of substandard care demonstrated deliberate indifference**

Corporate liability can be demonstrated indirectly "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." Woodward v. Corr. Med Services of Illinois, Inc., 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir.1995)). As in Woodward, there is more than sufficient evidence in this case for a jury to conclude that Wexford's actual practice (as opposed to their written policies) involving the medical treatment and follow up care of inmates was so inadequate that Wexford was on notice that there was a substantial risk that Shields would be deprived of necessary care in violation of his Eighth Amendment Rights. Id. It is not necessary to identify any policy or procedure which violated Shields' constitutional rights. Id.

**A.  Wexford was riddled with employment issues and condoned the reckless conduct of its employees**

Dr. Migliorino was employed as the Medical Director at Hill Correctional Center and provided treatment to the Plaintiff on the day he injured his shoulder, June 16, 2008, until he was terminated in October 2008. See Exhibit G-Dep. of Funk I at 73. As Medical Director, Dr. Migliorino was obligated "to determine that [Shields] was getting the proper treatment." See Exhibit K-Dep of Migliorino at 67. Dr. Migliorino was involuntarily terminated from his

employment as Medical Director for "not treating an individual properly." <u>See</u> Exhibit K-Dep of Migliorino at 21. Dr. Migliorino was reported to have been lazy, falling asleep on the job, failing to follow through with patients, and sloppy in appearance. <u>See</u> Exhibit O-Dep of Lindorff at 61-64; <u>see</u> Exhibit U-Dep of Williams at 46-50; <u>see</u> Exhibit N-Dep of Brown at 32-38. Complaints about Dr. Migliorino's patient care was brought to Dr. Funk's and Wexford's attention soon after Dr. Migliorino started working at Hill. <u>See</u> Exhibit O-Dep of Lindorff at 61-64; <u>see</u> Exhibit N-Dep of Brown at 32-38.

Several staff members that worked alongside Dr. Migliorino expressed ongoing concerns about his ability to deliver competent patient care. Specifically, Nurse Ruth Brown indicated that Dr. Migliorino would fall asleep at work "several times a day." <u>See</u> Exhibit N-Dep of Ruth Brown at 37. Nurse Brown also testified that Dr. Migliorino fell asleep mid-sentence and even fell asleep during a patient examination. <u>Id.</u> at 33. Nurse Brown also observed that Dr. Migliorino often fell asleep while writing on patient charts, only to wake up and start writing notes on the wrong patient's chart. <u>Id.</u> at 34. Despite the fact that similar patient related complaints were waged against Dr. Migliorino early in his employment, Dr. Migliorino remained employed as Medical Director for a substantial period of time. <u>Id.</u> at 34-35. Nurse Brown was of the opinion that Dr. Migliorino's issues "would interfere with his care of patients." <u>See</u> Exhibit N-Dep of Brown at 34.

Nurse Brown wasn't alone in voicing concerns about Dr. Migliorino. Healthcare Unit Administrator Lois Lindorff also noticed that Dr. Migliorino fell asleep at work "quite often." <u>See</u> Exhibit O-Dep of Lindorff at 56. Lois also observed that Dr. Migliorino often failed to "follow up on the treatment that [] patients needed." <u>Id.</u> at 62. Nurse Lindorff indicated that she reported her concerns about Dr. Migliorino's patient care to Dr. Arthur Funk on at least five

different occasions.  Id. at 63.  Lois Lindorff reported her concerns to Dr. Funk because Dr. Funk was responsible for supervising the Medical Director position and handled issues relating to hiring, firing, discipline, etc.  See Exhibit G-Dep of Funk I at 26.  Despite the significant concerns voiced by staff, Dr. Migliorino remained as Medical Director, supervising the care of inmates, including Earnest Shields, for one and a half years.

Subjective recklessness as used in criminal law is the appropriate test for deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  Dr. Migliorino's pattern of problematic and careless behavior while on duty caring for and supervising the medical care of inmate patients including but not limited to frequently falling asleep, failing to follow up on patient care, and writing notes on the wrong patient's chart constitutes subjective recklessness.  Dr. Migliorino failed to appropriately follow the care of Shields up until his termination on October 7, 2008.  If falling asleep while driving constitutes criminal recklessness, certainly falling asleep during patient care does as well.  Peterson v. Farrakhan, 203 CV 319 PS, 2007 WL 2025213 (N.D. Ind. July 9, 2007).  Therefore, it follows that practicing medicine while asleep constitutes the requisite state of mind for recklessness and meets the standard of deliberate indifference.

Dr. Migliorino himself indicated the proper course of treatment for Shields on or about August 2008 was to "find somebody who feels comfortable doing the shoulder surgery," yet as Medical Director, he failed to do so.  See Exhibit K-Dep of Migliorino at 104.  Instead, he blindly signed off on the recommendations of a non-specialist despite reviewing and approving recent referral reports from numerous orthopedists all of whom indicated that Shields required surgery.  See Exhibit A-Med Recs at 24.  In fact, had Dr. Migliorino known that Dr. Olysav was

not a specialist, he would not have signed off on Dr. Olysav's recommendations.  See Exhibit K-Dep of Migliorino at 115-116.

**B.  There was a lack of direction as to whom was responsible for the care of inmates during the period of time when there was no Medical Director at Hill**

During the time period between the termination of Dr. Migliorino on October 7, 2008, until Shields' transfer to Stateville on January 14, 2009 (the "Lapse Period"), there was no Medical Director at Hill.  Wexford utilized only traveling physicians to fill in for patient care and a lack of continuity resulted.  During the Lapse Period, Shields was seen only twice by "acting" Medical Directors and many inmates received "substandard care."  See Exhibit P-Dep of Puisis at 26-27.  Specifically, Shields was seen by Dr. Lochard on October 11, 2008, and Dr. Mughall on October 26, 2008.  Dr. Schaefer reviewed Shields' chart on December 17, 2008, but was unsure whether he even saw or examined Shields on that date.  See Exhibit J-Dep of Schaefer at 42-44.  The various "acting" Medical Directors did not know what their respective roles were in the care and treatment of Shields, did not know what their title or duties and responsibilities were within the Wexford system, and Wexford did little or nothing to inform them.  Nevertheless, throughout the Lapse Period, Drs. Lochard, Mughall and Schaefer were responsible for controlling Shields' treatment along with Dr. Funk (through the collegial review process.)  See Exhibit G-Dep of Funk II at 59.  Dr. Funk supervised all of the Medical Directors in relation to referring out Shields for specialist care.  See Exhibit H-Dep of Funk II at 71-72.

For example, the Regional Medical Director at the time, Dr. Funk, was responsible for supervising these three physicians who he considered to be "acting" Medical Directors.  Dr. Funk testified that the "the physician who encountered [Shields] and addressed [Shields'] complaints" would be the physician whose responsibility it would be to follow up with the needs of Shields after the clinic visit.  See Exhibit G-Dep of Funk II at 59-60.  However, the "acting"

Medical Directors were of a different mind than Dr. Funk and the administrators at Wexford. When Dr. Lochard was questioned as to his role at Hill during the Lapse Period, he testified contrary to Dr. Funk.  See Exhibit Q-Dep of Lochard at 13, 21-22.  Dr. Lochard indicated that he was not responsible for the care of the patient after he saw him and that he was only at Hill once a week.  Lochard Dep. at 13, 21-22.  He further testified that he was neither an "acting" Medical Director nor a "fill in" Medical Director.  See Exhibit Q-Dep of Lochard at 11.  As a result, Dr. Lochard took no steps to ensure that Shields was receiving follow up care after Shields' visit with him.  See Exhibit Q-Dep of Lochard at 27.  Dr. Lochard's understanding of his role, therefore,   as quite different that what Dr. Funk assumed it to be and illustrates another example of the confusion that led to inadequate medical care for Shields.

Consequently, according to Dr. Lochard, his responsibility to Shields ended on October 11, 2008, but, according to Dr. Funk, this responsibility was expected to continue to October 26, 2008, when Shields was seen by Dr. Mughall.  When Dr. Mughall saw Shields on October 26th he noted that it was important for Shields to attend his third physical therapy session with Jason Grandone of Cottage Rehabilitation & Sports Medicine.  See Exhibit A-Med Recs at 38-39.  In response to Shields' request for surgery (as he was told by two orthopedic specialists) rather than physical therapy, Dr. Mughall insisted that Shields either go to physical therapy or sign a "refusal of treatment" form.  See Exhibit A-Med Recs at 38-39.  However, Shields signed no such form and went for his third and final physical therapy session at Cottage Rehab.  See Exhibit A-Med Recs at 41.  Shields was compliant with the physical therapist and performed all therapy to the best of his ability.  See Exhibit U-Dep of Grandone at 26-56.

### C.   It was the responsibility of the "acting" Medical Directors, in conjunction with Dr. Funk to ensure that Plaintiff obtained the proper follow up care after the physical therapy sessions ended

During Shields' final physical therapy session, the attending physical therapist noted "patient has not benefited from [physical therapy] and has been unable to progress toward pain relief and [range of motion] goals per MD." See Exhibit A- Med Recs at 132. He further stated that Shields would "benefit from [evaluation] by orthopedic [doctor]." Id. Therefore, Dr. Funk and Dr. Mughall had the responsibility to ensure that Shields received appropriate follow up care with an orthopedic shoulder specialist. However, the record is devoid of any further action by Dr. Mughall to follow up on the care for Shields. To the contrary, the Medical Special Services Referral and Report form, which provides for a physician's review and further action if necessary, was not reviewed by a physician at all. See Exhibit A-Med Recs at 41. The form was supposed to have been reviewed, approved, and signed, but this was not done. Id; see other filled out referral forms at Exhibit A-Med Recs at 24, 30, etc.

The next time Shields was seen by any physician was nearly two months later on December 17, 2008 by Dr. Schaefer. Dr. Schaefer failed to review any of the recommendations of either the previous orthopedic surgeons or the physical therapist when he concluded "no further medical interventions planned." See Exhibit J-Dep of Schaefer at 29. Remarkably, Dr. Schaefer was of the opinion and concluded that there was "no plan" for Shields when he saw him on December 17, 2008. Schaefer Dep. at 43. Quite obviously, Dr. Schaefer did not even bother to read Shields' chart because if he had read it he would have seen that the physical therapist has recommended follow up with an orthopedist, and he would have seen that two other orthopedists had recommended surgery. Despite this information being present in the chart at the time Dr. Schaefer saw Shields, Dr. Schaefer remarkably testified that if some specialists recommended surgery while others did not, he would be "heavily swayed" by what Shields wanted. The indifference is obvious because the record is clear that not only did Shields want surgery, but

there are records by Drs. Schierer, Clark and Gibbons recommending surgery.  See Exhibit J-Dep of Schaefer at 39, 45, 53.

There is no greater example of the indifference afforded Shields than Dr. Schaefer's interpretation of his own note regarding the lack of necessity of treatment for Shields. Dr. Schaefer testified that his conclusion that no plan was necessary for Shields was based on the fact that "this was an injury of longstanding that had been seen prior to my . . . coming on the situation."  See Exhibit J-Dep of Schaefer at 44.  He considered an injury to be longstanding if it was over a year old and would not consider an injury that would have occurred in June of 2008 to be longstanding.  Id.  Shields injury occurred in June of 2008 and consequently, Dr. Schaefer was incorrect in concluding that Shields' injury was longstanding, according to his own definition.   Using that incorrect conclusion, Dr. Schaefer, Dr. Funk, and Wexford determined that there was "no plan" necessary for Shields to See a specialist or even follow up with Dr. Olysav.  See Exhibit J-Dep of Schaefer at 40-45.  There is no question that Schaefer, along with Dr. Lochard and Mughall, were deliberately indifferent to the needs of Shields.  These actions amount to more than just negligence, they amount to complete lack of any concern whatsoever for the medical needs of Shields.  Having concluded that there was no plan for further treatment of Shields, Schaefer removed the medical hold on Shields and he was eventually transferred to Stateville on January 14, 2009, with no treatment plan in place.

### D.  The Wexford defendants were deliberately indifferent to the medical needs of Shields after he was transferred to Stateville

After Shields was transferred to Stateville on January 14, 2009, his medical care did not improve.  Despite repeated complaints of pain and weakness in his shoulder, Shields was not seen by a physician at Stateville until several months later on May 1, 2009.  See Exhibit A-Med Recs at 47.  Furthermore, he was not referred to or seen by an orthopedic shoulder specialist until

July 31, 2009. At that point, a shoulder specialist at University of Illinois at Chicago examined Shields and determined that it was too late—Shields "was too far out for surgical intervention." See Exhibit A-Med Recs at 49, 65-66. Defendant Wexford not only mismanaged Shields' care, but it was completely indifferent to his medical needs.

VI.     **Wexford Did Not Have a System in Place to Ensure Continuity of Care and Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Plaintiff's institutional expert, Dr. David Kenney, MD, DDS CCHP, rendered an opinion on the series of continuity of care issues in the case at bar. According to his report, a series of "continuity of care issues prevented this patient from receiving timely, corrective surgical treatment for his condition" and "multiple systemic issues progressively contributed to the outcome." See Exhibit R-Report and C.V. of Dr. Kenney. He further indicated that "lack of a responsible on-site physician for a significant period (the Lapse Period) interrupted the continuity of care and prevented the patient from receiving potential corrective, time-sensitive surgical treatment." Id. Wexford was aware of all deficiencies referenced in Dr. Kenney's report and yet took no corrective action knowing that there was a substantial risk that Shields would be deprived of necessary care.

Dr. Michael Puisis who previously worked as a Medical Director for the Illinois Department of Corrections, also identified many issues involving Wexford that negatively affected health care operations at Hill both prior to and during the Lapse Period. Namely, he indicated that "there wasn't always a doctor and things weren't getting done." See Exhibit P-Dep of Puisis at 16-17. In addition, Dr. Puisis indicated Wexford was riddled with employment related issues so that overall "the care was not good." Id. at 14-15. Finally, and most importantly, Dr. Puisis indicated that Wexford provided substandard care to the inmates at Hill Correctional. Id. at 26-27. Thus, Wexford knew of its deficiencies in patient care and the

possible detrimental effect such deficiencies could have on its patients yet failed to anything about it, thereby condoning and adopting the misconduct of its subordinate officers. No better example of Wexford's irresponsible attitude towards patient care exists than the testimony of Dr. Funk when questioned on why he deferred to Dr. Olysav's opinions over those of other orthopedic specialists. The pertinent testimony is as follows:

> Q  I thought your statement was defer to Dr. Olysav's opinion in that circumstance because he had the more narrowed specialty being the shoulder specialist?
>
> A.  That is correct.

See Exhibit G-Dep of Funk I at 112.

To adopt such an obdurate attitude, blindly, without any investigation whatsoever even after being involved in the collegial review process leading up to Dr. Olysav's treatment is more than deliberate indifference, it is complete reckless regard of the health of Shields.

VII.    **By the Time Wexford Referred Shields to the Correct Shoulder Specialist, it Was Too Late**

By the time Shields was seen by a shoulder specialist capable of performing the necessary surgery, over one year had passed since his initial injury and his injury was "too far out for surgical intervention." This is, in part, due to the fact that "[b]eyond two to three months, [torn pectoralis surgeries] become really difficult to do and that patients are not substantially helped by surgery after one year. See Exhibit L-Dep of McFarland at 46. As a result, Shields was not able to obtain the requisite surgery in a timely fashion so as to prevent permanent injury. As testified by Dr. McFarland, the one year cut off is significant in treating this type of injury and the chances of regaining any normality drops precipitously after that one year grace period. Therefore, there are two critical points for surgery: (1) within 2-3 months after injury; and (2)

after one year.  As a result, Shields experienced a permanent loss of function, atrophy, and deformity in the left shoulder area.

## **Conclusion**

Wexford Health Sources, Inc., Dr. Richard Shute, Dr. Robert Migliorino, Dr. Ronald Schaefer and Dr. Arthur Funk were all deliberately indifferent to Shields' serious medical needs. All defendants knew that Shields needed surgery performed by a qualified shoulder specialist and each one played a significant role in ensuring that Shields never received the surgery. As a result, Shields experienced a permanent loss of function, atrophy, and deformity in the left shoulder area. Just as Medical Director Dr. Migliorino was literally "asleep at the switch" so were the supervising physicians, administrative staff and other responsible persons at Wexford . They all did not think Shields needed surgery despite Shields' pleas and a record that fully documented the need for surgery. Shields was forced to face a system full of continuous and systemic dysfunction, where as an inmate he could not choose his own physician and/or received his recommended treatment plan and was forced to rely on others to his detriment. Mr. Shields' constitutional rights were violated and as such summary judgment is not appropriate.

Respectfully Submitted,

EARNEST SHIELDS

/s/ James A. Karamanis
James A. Karamanis

James A. Karamanis (ARDC No. 6203479)
BARNEY & KARAMANIS, LLP
Two Prudential Plaza
180 N. Stetson #3050
Chicago, IL 60601
(312)553-5300

## <u>CERTIFICATE OF SERVICE</u>

I, James A. Karamanis, on oath state that a true and correct copy of the Notice of Filing was electronically filed with the Clerk of Court on December 29, 2011, using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.  Under the penalties of perjury, I certify that the above statements set forth herein are true and correct.

/s/ James A. Karamanis

James A. Karamanis
